IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TYRELL KNIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | 4:04cv3358 |
| | ) | |
| vs. | ) | MEMORANDUM AND ORDER |
| | ) | |
| DR. KAMAL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the following pending motions: (1) filing no. 112, the Motion for Immediate Injunction filed by the plaintiff, Tyrell Knight; (2) filing no. 114, the Motion for Summary Judgment filed by the defendants, Wayne Chandler, Douglas K. Diltz, Mohammad Kamal and Christine Mildorfer; (3) filing no. 120, the plaintiff's Opposition to the Defendants' Motion for Summary Judgment; and (4) filing no. 125, the plaintiff's Motion for a TRO/Preliminary Injunction. The plaintiff, a prisoner in the custody of the Nebraska Department of Correctional Services ("DCS"), asserts federal civil rights claims pursuant to 42 U.S.C. § 1983. He alleges that prison officials and medical staff have subjected him to the administration of antipsychotic medication without his consent and have provided deficient medical treatment, in violation of the Eighth Amendment to the U.S. Constitution.

The plaintiff's claims, as amended and supplemented, are set forth in his complaint (filing no. 1), Amended Complaint (filing no. 13), Evidentiary Supplement to Amended Complaint (filing no.17), Supplement (filing no. 22), Amendment (filing no. 24), Supplement (filing no. 26), Amendment (filing no. 33), and Amended and Restated Complaint (filing no. 35). The plaintiff alleges that on September 8, 2003, the following persons participated in the administration of antipsychotic drugs to the plaintiff against his will: Dr. Mohammad

1

S. Kamal, a psychiatrist; Wayne Chandler, a mental health practitioner at the Nebraska State Penitentiary ("NSP"); Nurse Christine Mildorfer; and Captain Douglas K. Diltz, a corrections officer at the NSP. The plaintiff has sued all defendants in their individual and official capacities (filing no. 35 at 4) for monetary[1] and injunctive relief.

### Summary Judgment Standard

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327(1986). The court must examine the record in the light most favorable to the nonmoving party. See, e.g., Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

---

[1]Any claim for damages by the plaintiff against the defendants in their official capacity must be dismissed on the basis of sovereign immunity. The Eleventh Amendment to the U.S. Constitution bars claims for monetary relief by private parties against a state, a state agency or an employee of a state in the employee's official capacity. See, e.g., Edelman v. Jordan, 415 U.S. 651, 663 (1974) ("a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."). The Eleventh Amendment prevents the plaintiff from recovering damages pursuant to 42 U.S.C. § 1983 from state employees in their official capacity because a suit against a public employee in his or her official capacity is considered a suit against the public employer. Kentucky v. Graham, 473 U.S. 159, 165 (1985). Insofar as the defendants acted as employees of the State of Nebraska, the State's sovereign immunity extends to the State's employees in their official capacity.

material fact." Celotex Corp. v. Catrett, 477 U.S. at 323. In response, the opponent must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." Id. at 586.

"[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment as a matter of law .... Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted). Accord Dico, Inc. v. Amoco Oil Co., 340 F.3d 525, 529 (8th Cir. 2003). "If the evidence is merely colorable ... or is not sufficiently probative ... summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The court may not weigh the evidence, determine credibility, or decide the truth of any factual matter in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; Tatum v. City of Berkeley, 408 F.3d 543, 549 (8th Cir. 2005). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.

### Qualified Immunity

The defendants claim qualified immunity for the plaintiff's damages claims against them in their individual capacity. Qualified immunity is a question of law to be determined by the court and should ordinarily be decided long before trial. Hunter v. Bryant, 502 U.S. 224, 228 (1991).

A government employee, sued for damages in his or her individual capacity

pursuant to 42 U.S.C. § 1983, is entitled to qualified immunity unless the plaintiff shows that the defendant violated the plaintiff's "clearly established" federal statutory or constitutional right. For a right to be considered "clearly established," the plaintiff must demonstrate that a reasonable person would have known: (a) of the plaintiff's right and (b) that the conduct at issue violated the plaintiff's right. See Anderson v. Creighton, 483 U.S. 635, 639-40 (1987): "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (citations omitted).

Qualified immunity is the norm. "[The plaintiff's] burden is not easily discharged: 'That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*.'" Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996) (emphasis in original; citation omitted). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful 'in light of clearly established law and the information [that the defendant] possessed .... The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." ' " Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000).

As the threshold inquiry for a summary judgment motion based on qualified immunity, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendant's conduct violated a

4

constitutional right. Brosseau v. Haugen, 125 S.Ct. 596, 598 (2004); Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005). "If those facts, once established, would not amount to a constitutional violation, the inquiry ends." McVay ex rel. Estate of McVay v. Sisters of Mercy Health System, 399 F.3d 904, 908 (8th Cir. 2005). See also Saucier v. Katz, 533 U.S. 194, 201 (2001) ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."), *citing* Siegert v. Gilley, 500 U.S. 226, 232 (1991).

If the plaintiff has sufficiently alleged the violation of a constitutional right, "the next inquiry 'is to ask whether the right was clearly established.'" Frye v. Kansas City Missouri Police Dept., 375 F.3d 785, 789 (8th Cir. 2004) (citation omitted). The Supreme Court in Hope v. Pelzer, 536 U.S. 730 (2002), explained "clearly established" law as follows.  A government employee charged with the federal criminal offense of willfully and under color of law depriving a person of constitutional rights, under 18 U.S.C. § 242, is entitled to "fair warning" that the conduct in question would deprive the victim of a constitutional right. Id. at 739-40.  The "fair warning" requirement of 18 U.S.C. § 242 is identical to the qualified immunity standard for a civil damages claim under 42 U.S.C. § 1983. Id. at 740-41.  Thus, the "salient question" for qualified immunity is whether the state of the law when the defendant acted gave the defendant "fair warning" that his or her conduct was unconstitutional. Id. at 741. "If the law did not put the defendant on notice that his or her conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier v. Katz, 533 U.S. at 202.  Put another way, "[u]nder the doctrine of qualified immunity, 'officials are not liable for bad guesses in gray areas;  they are liable for transgressing bright lines.'" Figg v. Schroeder, 312 F.3d 625, 636 (4th Cir. 2002)

(citation omitted).

Wayne Chandler

In his Affidavit (filing no. 116-3), Wayne Chandler states that after he received a telephone call at home on a weekend from the NSP Officer of the Day concerning the plaintiff's behavior, he interviewed the plaintiff on the following Monday, September 8, 2003, at which time he found the plaintiff's demeanor odd and disturbing. The plaintiff spoke loudly and forcefully, could not stay on topic, exhibited an "expansive" affect and a range of moods including yelling, crying and laughing. He reported inability to sleep and constant pacing, and he requested medications to help him relax. According to Chandler, the plaintiff "began to punch himself in the face as he talked about staff penetrating him." Chandler reviewed the plaintiff's patient history and learned that the plaintiff had previously been hospitalized and medicated on multiple occasions.

Chandler sent the plaintiff to the NSP hospital. Two guards arrived to escort the plaintiff to the hospital, at which point Chandler's involvement in the events of September 8, 2003 ended.

The plaintiff denies (filing no. 122) that he requested any medications in his interview with Chandler or that he punched himself in the face or talked about staff penetrating him. The plaintiff has alleged that Chandler threatened him, and Chandler denies making any threats. Chandler lacks a license to prescribe medications. In filing no. 122, the plaintiff acknowledges that the only undisputed fact concerning Chandler is that Chandler ordered the plaintiff to be escorted to the NSP hospital.

I am not permitted to decide disputed factual issues or to make credibility determinations in the context of a summary judgment motion. Scott v. Coughlin, 344 F.3d

282, 289-90 (2d Cir. 2003). However, even viewing the record in the light most favorable to the plaintiff, Chandler's only affirmative conduct consisted of referring the plaintiff to the NSP hospital. Chandler lacked authority to prescribe medication for the plaintiff, or to decide whether medication would be administered. At most, Chandler could only recommend, and a physician had to exercise independent judgment regarding the plaintiff's treatment. An order referring an inmate to a prison hospital and directing security guards to transport him there, at least in the circumstances of this case, does not violate the Constitution or laws of the United States.

Thus, the plaintiff's claim against Chandler does not pass the threshold test for a summary judgment motion based on qualified immunity. The facts, taken in the light most favorable to the plaintiff, do not demonstrate that Chandler's conduct violated any of the plaintiff's constitutional right(s). Filing no. 114, the defendants' Motion for Summary Judgment will be granted in favor of Wayne Chandler.

Douglas K. Diltz

In his Amended Complaint (filing no. 13) and in his statement of proof (filing no. 17), the plaintiff complains that upon his arrival at the NSP hospital on September 8, 2003, Nurse Christine Mildorfer, at the direction of Dr. Mohammad Kamal, injected the plaintiff with a shot of Haldol and another of Ativan. Also present were "Captain John Doe and several ranking officers" who, according to the plaintiff, declared that the plaintiff was under a direct order to "take the medications, You don't want to be held down so do it the easy way" (filing no. 13 at 1). The plaintiff states that he was "non compos mentis" at the time (filing no. 17 at 1), and that he complied "only because they told me that they would hold me down if necessary and cause I was given a Direct Order" (filing no. 13 at 1, emphasis

7

in original).  He denies having freely and voluntarily consented to the injections:

> They shot me up with injections of haldol and ativan against my will.  I didn't give them permission to inject me with any medication.  I was trying to refuse but they threatened to hold me down.  I was following a direct order and I complied so that I wouldn't be held down.

(Filing no. 13 at 1-2.)

On September 8, 2003 and thereafter, the plaintiff did not know which officer threatened to hold him down.  After he filed his complaint on November 19, 2004 against various defendants including "Captain John Doe," the plaintiff sent an Inmate Interview Request ("kite") to NSP Captain Johnson (filing no. 85-1 at 10) inquiring whether Johnson had been present at the NSP hospital on the occasion in September 2003 when the plaintiff received the injections of Haldol and Ativan.  Johnson responded: "It wasn't me."

Then the plaintiff apparently wrote to Captain Wright who also denied being present, as on December 26, 2004, the plaintiff sent a kite to Diltz (filing no. 85-1 at 13) stating: "Now Captain Wright says it was not him. Who was it? Who was present 2003 September when nurse Jane J. Doe shot me up with Haldol and Ativan.  I'm sure it was you Diltz. cause Wright said it wasn't him."   Diltz replied (id.) to the plaintiff's kite: "I don't believe that it was me you are referring to.  The only other captain is Johnson.  I can tell you that the procedure you are talking about would not normally require a Captain being present.  You might check with one of the Sgts."

As late as January 2, 2005, the plaintiff informed the court (filing no. 17 at 2) that he was still "working on finding out who Captain John Doe is.  It's only three Captains and they all denying allegations.  So now I must go to the Major to see which Captain was on duty September 8th, 2003 1500 hrs."  The plaintiff learned from the Warden on February 9,

8

2005, that all three Captains were working on September 8, 2003 at 1500 hours (filing no. 85-1 at 12).  Apparently, the plaintiff abandoned further inquiries thereafter and selected Captain Diltz as the most likely suspect.  On February 23, 2005, the plaintiff informed the court in an Amendment to the Complaint (filing no. 35-1) that the defendant previously known as John Doe was Captain Diltz.  Later the plaintiff reiterated his beliefs that the officer in question held the rank of Captain; that Captain Diltz had been present at the NSP hospital on September 8, 2003, and that Diltz would have held him down if the plaintiff had resisted the injection of medications (filing no. 121 at 4, filing no. 122 at 2).

Captain Diltz has filed an Affidavit (filing no. 116-4) denying that he had any involvement at all in the administration of medication to the plaintiff on September 8, 2003. Once again, the court may not weigh evidence, determine credibility, or decide the truth of any factual matter in dispute.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; Tatum v. City of Berkeley, 408 F.3d 543, 549 (8th Cir. 2005).  However, while the court may not decide disputed issues of fact, the plaintiff may not rest on his pleadings alone but must come forward with evidence to rebut his opponent's evidentiary showing.

The plaintiff has not come forward with any actual *evidence* to rebut Diltz's sworn testimony that Diltz was not even present during the events which are the subject of this litigation.  Indeed, the record demonstrates that until a few days before the plaintiff decided to substitute Diltz for defendant-John Doe in this litigation, the plaintiff was still engaged in trying to discover which officer(s) had been present at the NSP hospital on September 8, 2003.  The plaintiff has produced no actual proof tying Diltz to the "John Doe" officer present at the hospital on the day in question, and Diltz's sworn denial of involvement stands unrebutted.  As the record lacks any evidence on which to proceed to trial against

Diltz regarding the events of September 8, 2003, he is entitled to summary judgment.

Dr. Mohammad Kamal and Nurse Christine Mildorfer

The administration of antipsychotic medication to an unwilling prisoner is not forbidden but is circumscribed by due process protections. Washington v. Harper, 494 U.S. 210 (1990). In Harper, 494 U.S. at 221-27, the Supreme Court ruled that, under the Due Process Clause of the Fourteenth Amendment, a state prisoner has a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs. The Court balanced that interest against a state's interest in medicating a mentally ill prisoner and set forth standards governing when an inmate may be forcibly medicated against his will. See generally Sell v. United States, 539 U.S. 166, 178 (2003):

> In Harper, this Court recognized that an individual has a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs." 494 U.S., at 221 .... The Court considered a state law authorizing forced administration of those drugs "to inmates who are ⋯ gravely disabled or represent a significant danger to themselves or others." Id., at 226 .... The State had established "by a medical finding" that Harper, a mentally ill prison inmate, had "a mental disorder ⋯ which is likely to cause harm if not treated." Id., at 222 .... The treatment decision had been made "by a psychiatrist," it had been approved by "a reviewing psychiatrist," and it "ordered" medication only because that was "in the prisoner's medical interests, given the legitimate needs of his institutional confinement." Ibid.

Generally, an inmate has a liberty interest in avoiding the forced administration of antipsychotic drugs. At the same time, a state may have a legitimate interest in administering medication to treat a prison inmate with antipsychotic drugs against his will, if the inmate has a serious mental illness, is dangerous to himself or others, and the treatment is in the inmate's medical interest. Id. at 225-27. However, as the plaintiff correctly insists (filing no. 127; filing no. 147 at 5 "Plaintiff's Separate Statement"), a

prisoner is ordinarily entitled to due process protections **before** the State may forcibly attempt to medicate him with antipsychotic drugs.

Nevertheless, for two reasons, Dr. Kamal and Nurse Mildorfer are entitled to qualified immunity in the circumstances of this case. First, for whatever reason, the plaintiff admittedly did not resist the injections on September 8, 2003. Even if the plaintiff's acquiescence to the medication occurred because he felt coerced by the presence of, or statements by, corrections officers, the medical personnel, from their perspective, were not dealing with an *involuntary* administration of medication.

Second, Dr. Kamal and the plaintiff had previously met at the DCS Diagnostic and Evaluation Center. At that time, the plaintiff confided to Dr. Kamal a lengthy medical history of addictions, mental illnesses, hospitalizations and prescribed psychiatric medications. When the plaintiff arrived at the NSP hospital on September 8, 2003, he appeared to the medical personnel to be suffering from an acute anxiety attack. Although the plaintiff denies that he was actually suffering an anxiety attack, the physician's and nurse's notes at the time and their present testimony indicate that the plaintiff presented as a patient with the symptoms of acute anxiety and panic, spiraling out of control and in severe distress.

As for the applicable law in such circumstances, Senior District Judge Warren K. Urbom recently had occasion to discuss the involuntary medication of a prisoner in such an emergency. See Chapman v. Haney, 2004 WL 936682 (D. Neb. Apr. 30, 2004). When, in the opinion of licensed medical practitioners, emergency circumstances warrant the one-time or short-term administration of psychiatric medication, such as a tranquilizer or sedative, without the delay a hearing would entail, the usual policy, which calls for a

hearing before involuntary medication, may be suspended, without a forfeiture of qualified immunity.  Id. at *22-*32.  However, "the decision to administer psychotropic medication in an emergency may be made only by a qualified medical professional who has concluded, based upon his or her professional medical judgment, that the inmate has a serious mental illness, that the inmate is dangerous to himself or others, and that the administration of the medication is in the inmate's medical interest."  Id. at *26.  In addition, the medical decision-maker must be satisfied that sufficient urgency exists to depart from the normal due process procedures of notice and a full adversarial hearing to which a prisoner is ordinarily entitled before any forcible administration of medication is considered.  Id. at *28.

In light of the applicable law, and in the ambiguous circumstances of the plaintiff's medical condition, it was not "clearly established," and Dr. Kamal and Nurse Mildorfer did not have "fair warning," that administering a one-time injection of Haldol and Ativan to the plaintiff on September 8, 2003, would violate the plaintiff's constitutional right to due process.  Accordingly, filing no. 114, the defendants' Motion for Summary Judgment, is granted insofar as Dr. Kamal and Nurse Mildorfer claim qualified immunity for the incident on September 8, 2003.

### Extended Antipsychotic Drug Treatment

In February of 2006, a hearing convened at the NSP regarding an order for ongoing administration of psychotropic medication to the plaintiff without his consent.  The hearing resulted in a decision to administer medications. From March through May of 2006, the plaintiff attempted to expand the above-entitled case to include new claims and additional parties related to the events which occurred in 2006.  For example, in filing no. 125, the

plaintiff sought a TRO and Preliminary Injunction, and in filing no. 143, the plaintiff attempted to file an Amended Complaint adding additional claims and parties. In filing no. 148, the court denied the plaintiff's motion to amend the complaint but, at the plaintiff's request, directed the defendants to preserve a videotape which involved an involuntary administration of medication by use of force in February of 2006. Thus, the events of February 2006 and thereafter are beyond the scope of this litigation, but the plaintiff is, of course, entitled to bring a new lawsuit in state or federal court, if he wishes, concerning the developments in his medical treatment during 2006.

## Diabetes

Finally, the plaintiff expresses concern in the above-entitled case about the medical care he has received for a pre-diabetic or diabetic condition which he developed after the incident in September of 2003. The plaintiff attributes the rise in his blood sugar to the injection of Haldol and Ativan on September 8, 2003. However, as Dr. Kamal points out in his Affidavit (filing no. 116-2), no medical research known to Dr. Kamal supports an inference that diabetes or a borderline diabetic condition can result from a one-time administration of Haldol or Ativan. The plaintiff has presented no medical evidence to the contrary.[2]

THEREFORE, IT IS ORDERED:

1. That filing no. 114, the defendants' Motion for Summary Judgment, is granted;

2. That all other pending motions (filing nos. 112, 120 and 125) are denied;

---

[2] The record suggests that the plaintiff's weight has fluctuated considerably, and that with the gain of 40 or more pounds, his blood glucose level also tended to rise.

3. That the plaintiff's complaint, as amended, and this action are dismissed with prejudice; and

4. That judgment will be entered accordingly.

DATED this 16th day of August, 2006.

BY THE COURT:

s/Joseph F. Bataillon
JOSEPH F. BATAILLON
Chief District Judge